IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA TOMBLIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-1722 |
| | ) |
| RENDA BROADCASTING | ) |
| CORPORATION | ) |
| | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

CONTI, District Judge.

In this memorandum opinion, the court considers the motion for summary judgment filed by defendant Renda Broadcasting Corporation ("RBC" or "defendant"), with respect to all claims asserted by plaintiff Lisa Tomblin ("Tomblin" or "plaintiff") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 *et seq.* ("Title VII") and the Pennsylvania Human Relations Act, as amended, 43 PA. STAT. ANN. §§ 951 *et seq.* ("PHRA"). After considering the joint concise statement of material facts ("J.C.S."), defendant's motion for summary judgment, and the briefs and exhibits submitted by the parties with respect to the motion, the court will grant summary judgment in favor of defendant.

### Factual Background and Procedural History

Plaintiff is an African-American female. J.C.S. ¶ 4. RBC is the owner/operator of Pittsburgh radio station WSHH, at which plaintiff has been employed since June 7, 2002. Id. ¶¶ 2-3, 5. Plaintiff was initially hired as a part-time announcer/board operator. Id. ¶¶ 5, 10, 65. Plaintiff initially worked as an on-air announcer for a Sunday shift from 4:00 p.m. to 7:00 p.m. Id. ¶ 11. Tomblin eventually began to work a Saturday on-air shift from 10:00 a.m. to 3:00 p.m.

while continuing to work as a part-time radio board operator. Id. ¶ 12.

When Tomblin was hired at WSHH, the weekday mid-day on-air personality was Sherri White ("White"). Id. ¶ 17. Tomblin filled in for White on several occasions when White was on vacation or was not feeling well. Id. ¶ 20. She also briefly filled in for White at the beginning of White's maternity leave in August 2003. Id. ¶ 20-21. Ron Antill ("Antill"), program director at WSHH, testified in his deposition that Tomblin performed "OK" in this position. Id. ¶ 72. Tomblin did not appear on-air during the mid-day shift on a regular basis during this time period. Id. ¶ 21.

WSHH replaced White with a "virtual announcer" show utilizing the voice of Kathy Aparo, an announcer who resided in Florida. Id. ¶ 19. During this time, Tomblin and two other board operators continued to share mid-day board operator duties for the "virtual" mid-day show. Id. ¶ 23. In January 2004, White announced that she would not be returning from maternity leave. Id. ¶ 24. RBC posted the mid-day position the following month. Id. ¶ 25. A total of thirty people, including Tomblin, applied for the mid-day on-air position that opened in 2004. Id. ¶¶ 26-28. The overwhelming majority, including Tomblin, submitted either air checks or demo tapes. Id. ¶ 28. Tomblin informed Antill that the check tape she supplied was prepared at a time when she was experiencing a cold. Id. ¶ 66. Antill claims that he interviewed Tomblin for this position, while Tomblin claims she was not interviewed for this position. Id. ¶ 30. The mid-day on-air announcer position remained open through the summer of 2004. Id. ¶ 31.

In the meantime, consultants utilized by RBC recommended that WSHH move away from live on-air announcers during the weekends and replace them with "virtual shifts" by weekday full-time announcers. Id. ¶ 32. In June 2004, RBC's president, Anthony F. Renda, Sr. ("Renda Sr."), instructed Antill to take plaintiff off the air. Id. ¶¶ 6, 33. Renda, Sr. had listened

2

to plaintiff and concluded, based on his experience in radio, that plaintiff sounded "amateurish," "stilted" and "unsure." Id. ¶ 34. Renda Sr. had only heard plaintiff on the radio on one occasion when he requested her removal from the air. Id. ¶ 76. Renda Sr. told Antill that plaintiff's on-air performance lacked the "polish" expected of an on-air announcer at a major-market station such as WSHH. Id. ¶ 35.

On or about June 27, 2004, Antill told plaintiff that a decision had been made to use a "virtual" announcer over the weekends, and as a result, although plaintiff would continue to work as a board operator, she would be taken off the air. Id. ¶ 36. Tomblin claims that prior to June 27, 2004, no one at WSHH ever requested a meeting to discuss Tomblin's performance or criticized Tomblin's on-air performance. Id. ¶¶ 63. Tomblin was never provided a written evaluation of her on-air performance. Id. ¶ 62. RBC claims that Antill had told plaintiff that her on-air delivery "sounded like reading," and that she needs to sound less "breathy." Id. ¶ 55. Multiple witnesses for RBC, including its expert, testified at deposition that plaintiff has not performed at "major market" levels of professionalism in terms of sound and presentation. Id. ¶ 54. Despite these things, plaintiff continued as a part-time board operator at WSHH to the present day, with no reduction in her salary or benefits. Id. ¶ 37. Additionally, Renda, Sr., has had three white, male announcers removed from the airwaves for performance related reasons in recent years. Id. ¶ 61.

In August 2004, WSHH hired Cynthia Brennan ("Brennan"), a Caucasian female, for the mid-day on-air announcer position. Id. ¶ 38. Brennan had no on-air radio experience, or any experience in operating a radio board. Id. ¶¶ 68, 69. After the decision to hire Brennan was announced, Antill told plaintiff that WSHH was hiring Brennan because of her background in television and radio as well as voice-over work. Id. ¶ 40. WSHH general manager, Tony Renda,

3

Jr. also told plaintiff that Brennan was being hired because of her background in voice-over work and commercials. Id. ¶ 41. Antill requested that plaintiff train and assist Brennan in operating the radio board. Id. ¶¶ 44, 70, 82. Plaintiff complied with that request. Id. ¶ 44. Tomblin claims that Antill was not satisfied with Brennan's on-air performance, but worked to train Brennan rather than pulling her from the air. Pl.'s Br. at 11. Antill acknowledged that he offered Brennan feedback such as "[k]eep the break succinct, relax her presentation," and some direction on content and subject matter. Antill Dep. at 33-35. Antill also admitted that Brennan "fairly infrequently" missed cues. Id.

Brennan continued as the mid-day on-air personality at WSHH until June 2006, when she voluntarily resigned. J.C.S. ¶ 45. In Brennan's resignation letter she thanked the defendant as follows: "It is my deepest appreciation to you and your family for the respect that you have shown me. In allowing a professional in the business but a novice at the boards an opportunity to step into the mid-day position was a leap of faith for all of you, and I will forever be grateful." Id. ¶ 74. WSHH re-posted the mid-day position and beginning June 5, 2006, returned to the "virtual" show utilizing Aparo's voice. Id. ¶ 46. A total of 35 people, including Tomblin, applied for the mid-day on-air position in 2006. Id. ¶ 48. Antill interviewed five candidates for this position. Id. ¶ 49. Antill did not interview plaintiff in 2006 because he was already familiar with her work and had interviewed her in 2004. Id. ¶ 50.

RBC filled the mid-day on-air opening at WSHH in February 2007 through the hiring of Christine Ramsey, a/k/a/ Cris Winter ("Winter"), a Caucasian female. Id. ¶ 51-52. Winter was hired because she possessed an extensive resume of radio experience, including most recently at WWSW-FM (3WS), and also at WDVE-FM, and had the best performance in demo tapes submitted. Id. ¶ 53.

4

Gary Dickson ("Dickson") was hired in late August 2004 by RBC for a part-time weekend on-air position. Id. ¶ 56. Dickson had decades of full-time radio experience at stations in Pittsburgh, Houston and Boston. Id. ¶ 58. Dickson left WSHH at the beginning of 2005 to take over an all night talk show on KDKA. Id. ¶ 59. As a result, plaintiff's weekend hours increased when Dickson left. Id. ¶ 60.

RBC hired an expert radio consultant, Michael McVay ("McVay"), who testified at deposition that he reviewed and evaluated on-air performances of Tomblin and Brennan. McVay Dep. at 24-26. Without knowing the radio experience of either Tomblin or Brennan, McVay opined that Brennan is a significantly better sounding and more professionally toned air talent than Tomblin. Id. at 27:4-15; Def. Br. Ex. 7A. He further opined that Tomblin does not sound as if she is at the level of a major-market air personality. McVay Dep. at 29:2-3. At the time he rendered his opinion, McVay did not know that Tomblin was African-American. Id. at 29:16-19. Tomblin did not offer the testimony of an expert witness in this case.

On December 14, 2005, plaintiff commenced the above-captioned civil action asserting claims under Title VII and the PHRA for discrimination on the basis of race. The defendant filed an answer on February 14, 2006. Fact discovery was initially undertaken through September 12, 2006. Expert discovery, including the deposition of RBC's expert, Michael McVay, occurred between November 2006 and January 2007. Pursuant to this court's May 15, 2007 order, fact discovery was reopened for certain limited purposes until July 13, 2007. After the close of fact and expert discovery, RBC filed the present motion for summary judgment.

**Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249.

The Supreme Court held in Celotex Corp v. Catrett, 477 U.S. 317 (1986), that:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

Id. at 324 (emphasis added). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

## Discussion

### I. Burden-Shifting Framework

Title VII was enacted to prohibit employers from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment. Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981). The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with "conscious intent to discriminate." McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). One manner in which a plaintiff can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. Burdine, 450 U.S. at 253.

In McDonnell Douglas, the Supreme Court developed the now familiar burden-shifting framework for courts to utilize as a tool in analyzing disparate treatment claims. The McDonnell Douglas framework requires a plaintiff alleging a violation of Title VII to first establish a prima facie case of discrimination. The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." Burdine, 450 U.S. at 254. In so doing, "the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" Id.(quoting Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers, Division of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998). The burden on the defendant at

this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. . . . " Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (emphasis added) (citations omitted).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the McDonnell Douglas framework - with its presumptions and burdens' - disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non,*'. . . ." Reeves v. Sanderson Plumbing Products., Inc., 530 U.S. 133 (2000) (citations omitted). Plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

## II. Prima Facie Case

To state a claim for discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position for which she applied; (3) she was subject to adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's qualifications to fill the position. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 253; Sarullo v. United States Postal Service, 352 F.3d 789, 797 (3d Cir. 2003).

For purposes of this summary judgment motion, defendant conceded that the plaintiff set forth a prima facie case of discrimination. First, it is undisputed that plaintiff is an African-American and is a member of a protected class for her race discrimination claim. Second,

plaintiff was qualified for the position based upon her extensive radio experience and her part-time on-air work with RBC. Third, it is undisputed that plaintiff experienced adverse employment action by not being hired for the mid-day on-air position that opened in 2004. Finally, it is undisputed that RBC hired Brennan, a female Caucasian with no on-air experience to fill the mid-day on-air position. Based upon these facts viewed in the light most favorable to plaintiff, sufficient evidence has been presented to support an inference that an employment decision may have been based on an illegal discriminatory criterion.

### III. Defendant's Business Reasons

Since plaintiff presented sufficient evidence to support a prima facie case, the court must address the other factors in the McDonnell Douglas framework. Once a plaintiff has established a prima facie case the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for reasons that are legitimate and nondiscriminatory. Burdine, 450 U.S. at 254. An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. Fuentes, 32 F.3d at 763; see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers. Burdine, 450 U.S. at 254; see Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

In this instance, defendant offered legitimate business reasons for three separate adverse employment actions. The first legitimate business reason offered was that Brennan, who was hired for the on-air position in 2004 over Tomblin, was more experienced and better qualified for the position based upon her extensive voice-over and commercial work. Defendant also

9

claims that Brennan simply sounded better. Similarly, the second legitimate business reason offered was that Winter, who was hired for the on-air position in 2007 over Tomblin, had an extensive radio resume and performed well on demo tapes. Finally, the third legitimate business reason offered was that Tomblin was removed from the airwaves in 2004 because consultants recommended a move toward "virtual" announcers and Renda Sr. determined that plaintiff did not perform on-air at a major market level. These reasons satisfy defendant's burden of production under the McDonnell Douglas framework.

## IV. Pretext

The last part of the test requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." Fuentes, 32 F.3d at 763. Once an employer has stated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must meet the two-prong test articulated by the United States Court of Appeals for the Third Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Id. at 764.

### A. Prong One

A plaintiff must submit evidence that could cause a reasonable factfinder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary

10

judgment and bring her case to trial. To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, Sempier v. Johnson & Higgins, 45 F.3d 724, 764 (3d Cir. 1995), nor produce additional evidence beyond her prima facie case. Fuentes, 32 F.3d at 764. Plaintiff must, however, demonstrate such:

> "weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence'" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting [Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)]).

Simpson, 142 F.3d at 644.

The question asked in prong one of the Fuentes test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. Keller v. ORIX Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997). The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination. Ezold, 983 F.2d at 527. "Furthermore, the court should not examine the issue of whether the employee has skills in an area *other than that identified by the employer* as the basis for his or her termination, because the court then would be impermissibly substituting its own business judgment for that of the employer." Moorer v. Verizon Communications, Inc., Civ. No. 03-1265, 2005 WL 2807140 (W.D. PA. Oct. 27, 2005), aff'd, 211 Fed.Appx. 98 (3d Cir. 2006).

"An employment decision that would create a problem under prong one will likely turn on whether the stated reason for termination is so implausible that a factfinder could not believe

11

it [to be] worthy of credence." Orenge v. Veneman, Civ. No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006); see Menta v. Cmty. Coll. of Beaver County, 428 F.Supp. 2d. 365, 374 (W.D. Pa. 2006). For example, in Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995), the plaintiff was fired due to deficient sales performance. The evidence of record, however, disclosed that the plaintiff received a bonus three months prior to his termination and that he was the only sales employee in his region to have received such a bonus. The court held that, where the primary measure of the employee's performance was his sales, and where he was the leading salesperson in the region, the employer's stated reason for his termination was "contradictory to [its] admission that the most important standard of job performance is sales." Id. at 332. According to the court, "[a] factfinder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program - sales." Id.

Sempier is another case in which an employer stated the plaintiff was terminated because of poor performance causing the company to restructure the nature of his responsibilities. The evidence of record, however, disclosed that (1) the plaintiff never received any unfavorable criticism that his performance was poor or inadequate; and (2) the employer failed to produce any other evidence of poor performance or to make specific allegations of the plaintiff's deficiencies. Sempier, 45 F.3d at 731-33. Thus, there was evidence on the record that a reasonable factfinder could conclude that the reason given in Sempier by the employer was a pretext for age discrimination. Id. at 732-33.

In this case, Tomblin offered a list of eight possible "inconsistencies and contradictions" in an attempt to satisfy the first prong of the Fuentes test. First, Tomblin claims that she has a significant pre-employment on-air announcing background and was hired as an on-air

12

announcer.  Second, Tomblin claims that her on-air experience was expanded by an additional day and she was permitted to fill in for White, the regular full-time mid-day announcer, when she was ill or on vacation before her maternity leave in August 2003.  Third, Tomblin notes that she was not criticized in any fashion for her on-air performance.  Fourth, Tomblin claims that after applying for the full-time on-air position vacated by White, plaintiff, the only African-American in an on-air position with defendant, was removed from the air at the direction of Renda, Sr. and was not told about his reason for why she was removed.  Fifth, Tomblin claims that RBC proceeded to hire a Caucasian female for the vacant White position, who had no on-air experience, could not work a radio board or radio system, and later described her hiring as a "leap of faith."  Sixth, Tomblin notes that Renda, Sr. stated "We are not a training school", yet plaintiff was requested to and did train Brennan.  Seventh, Tomblin claims that she was not offered the same training and criticism that was provided to Brennan.  Finally, Tomblin claims that she was not told of the real reason for her removal from the air; rather she was told "they decided to make some changes."  (Tomblin Dep. 68:9-12.)

Here, none of the eight possible "inconsistencies and contradictions" are sufficient to raise a genuine issue of material fact.  None of the "inconsistencies and contradictions" alleged by plaintiff are directed at the legitimate business reasons offered by RBC; specifically, that plaintiff's voice was not "polished" and she sounded "amateurish."  Instead, the weaknesses and inconsistencies listed would require the court to determine whether defendant's business judgment is correct.  Since there is no evidence of discrimination within defendant's stated reasons, the matters asserted by plaintiff do not create a genuine issue of material fact.

Arguably the strongest inconsistency or weakness offered by plaintiff is that Renda, Sr. stated RBC is not in the business of training people, yet Tomblin was asked to train Brennan to

13

use the board and Maestro system.  This reason, however, is not enough to create an inference of discrimination.  When a person starts a new job it is common that he or she will need to be familiarized with the operating procedures of that particular place of business.  Simply because Brennan was not familiar with how to operate a radio board or the Maestro system does not cast doubt on the business reason offered by RBC for hiring her instead of Tomblin.  In radio it is axiomatic that the sound and quality of the on-air personality's voice is an important reason for hiring or not hiring that person as an on-air performer.  RBC has offered legitimate reasons why Brennan was hired over Tomblin, including that Tomblin lacked the "polished" voice expected for a major market.  Tomblin being requested to train Brennan after she was hired does not discredit the business decision to hire Brennan in the first place.  Tomblin was not training Brennan in on-air voice related issues, but only technical non-voice issues related to operation of the radio board.  Without "inconsistencies and contradictions" more clearly related to actual discrimination in the business decisions of RBC for hiring on-air personalities, i.e., relating to voice or sound matters, a finder of fact cannot infer that RBC's proffered business reason is "unworthy of credence."  As a result, plaintiff cannot satisfy her burden of proving that RBC's reason was pretextual under the first prong of Fuentes.

      B.      **Prong Two**

The court must next examine the second prong of the Fuentes framework to determine if plaintiff presented sufficient evidence of pretext.  To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that could allow a factfinder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision.  Simpson, 142 F.3d at 644-45.  Relevant evidence that could be relied on

in the evaluation of this prong includes: (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people within the plaintiff's protected class or within another protected class, or (3) whether the employer has treated more favorably similarly situated persons not within the protected class. Id. at 645.

### (1) Evidence of previous discrimination against plaintiff

Tomblin points to her removal from the air in 2004 as evidence of previous discrimination against plaintiff. Plaintiff notes that Renda Sr. removed Tomblin after only hearing her once on the air, because she was not "polished" enough for a major market station. Plaintiff contends that because she was told a different reason for being removed from the air, specifically that the station was switching to a virtual announcer, this inconsistency is evidence of an illegitimate discriminatory motive. Under the circumstances of this case, the court does not find this argument persuasive. Importantly, Tomblin does not allege that Renda Sr. knew that she was African-American when he decided to remove her from the air or that Tomblin was removed from the air because she was African-American. Renda Sr. removed Tomblin from the air after *hearing* her once, and plaintiff does not even allege that Renda Sr. removed her because he thought she sounded like an African-American. Tomblin did not present sufficient evidence of previous discrimination for a reasonable jury to find in favor of plaintiff with respect to this factor.

### (2) Whether the employer has discriminated against other people within plaintiff's protected class or another protected class

Tomblin presented no evidence of discrimination against other African-Americans or any other protected class by the employer. Tomblin maintains that this factor can not be sufficiently analyzed because plaintiff is the only African-American on-air announcer in any capacity

15

employed by defendant. Tomblin **does not** argue or present any evidence that under-representation of plaintiff's protected class by RBC constitutes discrimination. Nevertheless the court notes that the United States Court of Appeals for the Third Circuit recognized that "[s]tatistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext." Ezold, 983 F.2d at 542. The court of appeals, however, has also commented that raw numerical evidence alone is of little value without a demonstration of its significance to the employer's alleged discriminatory motive. Id.; Keller, 130 F.3d at 1112. Plaintiff has presented no evidence demonstrating the significance of a lack of African-American employees hired by RBC for on-air positions. Besides the evidence that Tomblin is the one African-American hired by RBC as an on-air announcer, Tomblin has presented no "analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period." Ezold, 983 F.2d at 543; see Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650-51 (1989) (in disparate impact case, proper comparison is between racial composition of at-issue jobs and racial composition of qualified population in relevant job market).

On the record before the court, plaintiff did not adduce sufficient evidence that defendant discriminated against other African-Americans. Based upon the undisputed evidence of record, viewing all disputed facts in favor of plaintiff, and drawing all reasonable inferences in favor of plaintiff, the court concludes a reasonable jury could not find in favor of plaintiff with respect to this factor.

### (3) Whether the employer has treated more favorably similarly situated persons not within the protected class

Plaintiff contends that Brennan, a Caucasian female, was similarly situated and treated more favorably than plaintiff. Although Brennan was hired for a full-time on-air position for which plaintiff also applied, Tomblin was asked to train Brennan on the operation of the radio board and Maestro. Tomblin also claims that Antill was not satisfied with Brennan's on-air performance, but worked to train Brennan rather than pulling her from the air. Antill acknowledged that he offered Brennan feedback such as "[k]eep the break succinct, relax her presentation," and some direction on content and subject matter. Antill Dep. At 33-35. Antill also admitted that Brennan "fairly infrequently" missed cues. Plaintiff, however, is missing the point. Id. The reason that Tomblin was taken off the air and not hired for any of the full-time on-air positions had nothing to do with whether she was able to make her cues or talk about the right subject matter or keep the break succinct or relax her presentation or even run the radio board and Maestro. As this court noted in Moorer v. Verizon Communications, Inc., "the court should not examine the issue of whether the employee has skills in an area *other than that identified by the employer* as the basis for his or her termination, because the court then would be impermissibly substituting its own business judgment for that of the employer." Moorer, 2005 WL 2807140 at 16. The reason defendant offered for taking Tomblin off the air and not hiring her for any full-time on-air position was that her voice did not sound "polished,"and she sounded "amateurish," "stilted" and "unsure." Although Brennan may have had some shortcomings in other areas, there are no allegations that her voice sounded unpolished, amateurish, stilted or unsure. In fact, when comparing Tomblin's voice to Brennan's voice, Renda Jr. stated, "there's a clear defined difference in delivery, in natural fluidity." Defendant's expert also pointed out

the difference. Without knowing the radio experience of either Tomblin or Brennan, McVay opined that Brennan is a significantly better sounding and more professionally toned air talent than Tomblin. Def. Br. Ex. 7A. He further opined that Tomblin does not sound as if she is at the level of a major-market air personality. McVay Dep. at 29:2-3. Plaintiff did not present evidence sufficient to enable a reasonable jury to conclude that defendant treated non-protected class members more favorably than those within the protected class.

Plaintiff did not present sufficient evidence of pretext under the second prong of the Fuentes framework. Plaintiff did not show that discrimination was more likely than not a cause for the employer's adverse actions. Plaintiff did not point to evidence with sufficient probative force that could allow a reasonable factfinder to conclude that plaintiff's race was a motivating or determinative factor in RBC's employment decisions.

## Conclusion

Based upon the undisputed evidence of record, viewing all disputed facts in favor of plaintiff and drawing all reasonable inferences in favor of plaintiff, the court concludes that a reasonable jury could not render a verdict in favor of plaintiff with respect to her claims of race discrimination. Plaintiff presented insufficient evidence to establish pretext to overcome RBC's stated legitimate, nondiscriminatory reasons for the adverse employment decisions. Therefore, summary judgment must be granted in favor of defendant with respect to plaintiff's claims made under Title VII and the PHRA. The clerk will mark this case closed.

By the court,

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: March 24, 2008

cc: Counsel of Record